**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**NELSON TORRES DE LIMA NETO,**

      **Plaintiff,**

      **v.**

**JOHN THOMPSON, District Director for U.S Citizenship and Immigration Services (USCIS) Northeast Region, and PAULO CORREIA, Field Office Director of the USCIS-Newark Field Office,**

      **Defendants.**

Civ. No. 20-00618 (KM) (JBC)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

    Nelson Torres de Lima Neto, a non-citizen, applied to the United States Citizenship and Immigration Services (the "Service") for adjustment of his immigration status to a lawful permanent resident. The Service denied his application based on its interpretation of 8 U.S.C. § 1182(a)(9)(B)(i)(II) (which I will call "(B)(i)(II)"), a provision that renders certain aliens inadmissible and thus ineligible for adjustment of status. Neto[1] seeks review and vacatur of the Service's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and asks for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. The Service moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) (DE 11), and Neto both opposes and moves for summary judgment (DE 14).[2] For the following reasons, the Service's motion to dismiss is **DENIED** and Neto's motion for summary judgment is **GRANTED**.

---

[1]    The plaintiff refers to himself as "Neto."

[2]    Certain citations to the record are abbreviated as follows:

    DE = Docket entry number

    Compl. = Complaint (DE 1)

## I.   BACKGROUND

### A. Facts[3]

Neto, a Brazilian citizen, was lawfully admitted into the United States in 1993 on a tourist visa. (Compl. ¶¶ 11–12.) He overstayed his visa and was ordered deported in 1994. (*Id.* ¶¶ 13–14.) However, he did not leave the United States until 2000. (*Id.* ¶ 15.)

In 2002, Neto was again admitted to the United States on a tourist visa. (*Id.* ¶ 17.) In gaining admission, he allegedly did not disclose that he previously had been unlawfully present in the United States from 1994 to 2000. (App. 5.) He has remained in the United States since 2002. (Compl. ¶ 18.)

In 2016, Neto applied to the Service for adjustment of his status to that of a lawful permanent resident. (*Id.* ¶ 21.) Title 8, U.S. Code, § 1255 allows certain aliens to apply to have their status adjusted to lawful permanent residents. One precondition, however, is that the alien be "admissible to the United States." *Id.* § 1255(a). The Service denied Neto's application, determining that he was inadmissible. (Compl. ¶ 22.) He moved to reconsider, but the Service denied that motion as well. (*Id.* ¶¶ 23–24.)

In explaining both denials, the Service specified that Neto was inadmissible under (B)(i)(II), which provides that any alien who "has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States, is inadmissible." 8 U.S.C. § 1182(a)(9)(B)(i)(II). The Service explained that Neto became inadmissible under (B)(i)(II) in 2002, when he reentered the United States. (App. 3.) The Service further explained to him that "[t]he fact that the Service did not discover your inadmissibility . . . at

---

App. = Appendix to Complaint (DE 1-1)

Serv. MTD = The Service's Motion to Dismiss (DE 11-1)

Pl. Opp. = Neto's Opposition to the Service's Motion to Dismiss (DE 14)

Serv. Reply = The Service's Reply Brief to Neto's Opposition (DE 15)

[3]    The facts are not in dispute.

the time of your entry on May 10, 2002 does not preclude the finding of your inadmissibility at this juncture." (App. 6.)

### B. Procedural History

In this action, Neto seeks judicial review under the APA and asks me to (1) hold that the Service's decision was "arbitrary, capricious, . . . or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); (2) issue a declaratory judgment to that effect, and (3) order the Service to reopen his application for adjustment of status and adjudicate it accordingly. (Compl., Prayer for Relief.) The Service has moved to dismiss the complaint for failure to state a claim. (Serv. MTD.)

In response, Neto filed what was styled as an "Opposition to Defendant's Motion to Dismiss and Motion for Summary Judgement for Non-Moving Party." Therein, he stated that the merits could be reached based on the Complaint and administrative record attached thereto, and so he asked the Court to "recharacterize" the Service's motion to dismiss as one for summary judgment or to grant summary judgment in his favor. (Pl. Opp. at 2.) The Service filed a reply brief that did not take issue with Neto's procedural requests. (Serv. Reply.)

## II.   LEGAL STANDARD

### A. Summary Judgment

I will take up Neto's motion for summary judgment because (1) Neto has moved for summary judgment on his sole claim, (2) that claim is purely legal, based on the administrative record, and (3) the Service has not opposed Neto's request for summary-judgment treatment. "When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks and citation omitted). This is especially true when, as here, the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action." *Rempfer v. Sharfstein*,

583 F.3d 860, 865 (D.C. Cir. 2009) (citation omitted). In such a case, "[a] court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage," and "there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *cf.* 5 U.S.C. § 706(2) ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law . . . ."). Accordingly, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Tomasi v. Township of Long Beach*, 364 F. Supp. 3d 376, 389 (D.N.J. 2019) (citation omitted), *aff'd*, 796 F. App'x 766 (3d Cir. 2020).[4]

Moreover, taking up Neto's motion for summary judgment complies with the Rules. A party can move for summary judgment "at any time until 30 days after the close of all discovery," Fed. R. Civ. P. 56(b), so there is no issue with deciding summary judgment now. Further, because Neto has explicitly moved for summary judgment on the only claim in this case, this is not a case in which the court's *sua sponte* action could deny a party a fair opportunity to respond. *See generally Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195–96 (3d Cir. 2019). Indeed, the Service was given notice of Neto's motion and an opportunity to respond, yet did not voice any opposition in its Reply.

---

[4]    The Third Circuit has not squarely addressed the principle that an APA case can be resolved on summary judgment even when the motion is presented as one to dismiss. But its disposition of APA cases suggests that it is receptive to the approach outlined by the D.C. Circuit. *See Comite De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 187 (3d Cir. 2014) (reversing district court's dismissal of APA claim, vacating the agency action in the first instance, and directing that judgment be entered for plaintiffs); *Byrne v. U.S. Dep't of Homeland Sec.*, 618 F. App'x 143, 145 (3d Cir. 2015) (affirming in APA case where defendants filed a motion to dismiss or, in the alternative, for summary judgment, and plaintiffs filed what they denominated a cross-motion for summary judgment, and district court granted summary judgment in defendants' favor).

Turning to the standard of review, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "While summary judgment is the proper mechanism" for APA cases like this one, "the usual summary judgment standard does not apply" in the sense that "the district court does not need to determine whether there are disputed facts to resolve at trial" since "the administrative agency is the finder of fact." *Soccer Ctrs., LLC v. Zuchowski*, Civ. No. 17-1024, 2017 WL 4570290, at *4 (D.N.J. Oct. 13, 2017) (citations omitted). Instead, my task is to review the administrative record and determine whether, as a matter of law, the Service's action complied with the APA. *Id.* at *4–5.

### B. APA

"The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). The APA empowers courts to review agency actions for whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In doing so, courts only review the grounds invoked by the agency when it made its decision. *Regents*, 140 S. Ct. at 1907.

"In some [APA] cases, an agency is alleged to have acted contrary to a statutory command or prohibition . . . . In other APA cases, by contrast, the agency is acknowledged to have discretion under the relevant statute, but is alleged to have exercised that discretion in an arbitrary and capricious (that is, unreasonable) manner." *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 934 (D.C. Cir. 2017) (Kavanaugh, J.) (internal citations omitted). Although the Complaint and Opposition make passing references to arbitrary-and-capricious review, this case falls within the first category of APA cases, as Neto claims that the Service's denial of his application was contrary to, and based on an incorrect interpretation of, (B)(i)(II).

In APA cases, a court is often called upon to apply the "*Chevron* framework" and determine (1) whether the statute is ambiguous regarding the question at issue, and if so, (2) whether the agency's interpretation is reasonable. *Chevron, USA, Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984). However, the Third Circuit has forgone the *Chevron* framework when an agency is not exercising rulemaking power delegated by Congress or employing its "expertise in the formulation of substantive policy." *Sandoval v. Reno*, 166 F.3d 225, 239 (3d Cir. 1999); *see also Da Silva v. Att'y Gen. U.S.*, 948 F.3d 629, 634–65 (3d Cir. 2020). Likewise, the Supreme Court has forgone *Chevron* analysis when the case presents a narrow question of statutory interpretation which the courts are equipped to decide, as opposed to cases in which the agency is filling a gap left by the statute. *See INS v. Cardoza-Fonesca*, 480 U.S. 421, 446–48 (1987). As the parties agree, this case presents "a pure question of statutory construction for the court[] to decide," so *Chevron* is inapplicable. *Id.* at 446. Moreover, the Service's interpretation comes in a letter denying an application, so it is not the type of fully researched and reasoned decision that is entitled to any deference beyond its power to persuade. *See, e.g.*, *Perez v. Cuccinelli*, 949 F.3d 865, 877 (4th Cir. 2020) (en banc) (Service decision in letter not entitled to deference); *Kaufman v. Nielsen*, 896 F.3d 475, 484–85 (D.C. Cir. 2018) (same); *Khalil v. Hazuda*, 833 F.3d 463, 469 (5th Cir. 2016) (same).[5] Accordingly, my task is to apply ordinary tools of statutory interpretation to determine whether the Service's interpretation and application of (B)(i)(II) is legally correct. *See Da Silva*, 948 F.3d at 634–65.

---

[5]     The Service does not claim that its interpretation is entitled to deference. Because I find that the *Chevron* framework does not apply here, I need not address the thorny question of whether an agency can waive or forfeit deference. *See generally Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 21–22 (D.C. Cir. 2019) (per curiam). I would note that ultimately *Chevron* step one and a straightforward statutory interpretation analysis would converge, in that both seek to determine the plain meaning, if any, of the statute. *See Sandoval*, 166 F.3d at 240.

### III.    DISCUSSION

In Section III.A, I discuss the interpretation of (B)(i)(II). Because I find that the Service's decision is not consistent with (B)(i)(II), in Section III.B, I discuss the appropriate remedy.

### A. Interpreting (B)(i)(II)

#### 1.        The interpretive problem

(B)(i)(II) provides that any alien who "has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States, is inadmissible." 8 U.S.C. § 1182(a)(9)(B)(i)(II).

Four pertinent scenarios suggest themselves. Each assumes an alien who was unlawfully present in the United States for one year or more, and then departed or was removed.

The first, which I will call Scenario A, is obvious and straightforward. Alien A seeks admission to the United States in year 5, *i.e.*, 5 years after her departure. Because the 10-year waiting period has not elapsed, Alien A is "inadmissible," and her application is denied under (B)(i)(II).

The second, Scenario B, is equally clear. Alien B seeks admission to the United States in year 11, *i.e.,* 11 years after his departure. Because the 10-year waiting period has elapsed, he is not "inadmissible" under (B)(i)(II). His application is not barred by (B)(i)(II) and may be granted if he meets all other requirements.

These first two scenarios closely track the statutory classification. But now consider Scenarios C and D.

Alien C, like Alien A, seeks admission to the United States in year 5. Because the 10-year waiting period has not elapsed, she is "inadmissible," and her application is denied. So, like Alien B, she applies for admission to the United States in year 11. Her situation is like that of Alien B in every respect except one: during the 10-year waiting period, she filed an unsuccessful application for admission. So she should be treated like Alien B, *unless* the

7

filing of the application within the 10-year period is a disqualification—*i.e.,* unless the "inadmissible" status attached when she applied in year 5, and is permanent.

Alien D, like Alien A, seeks admission to the United States in year 5. The 10-year waiting period has not yet elapsed, so she is "inadmissible." Nevertheless, Alien D is *granted* admission (perhaps by mistake, or because she failed to disclose the facts rendering her inadmissible). In year 11, she seeks an adjustment of status, which depends on her being currently "admissible." (In this sense, it is the functional equivalent of seeking admission.)[6] As in the case of Alien C, the issue boils down to whether Alien D's (B)(i)(II) "inadmissible" status, though unrecognized in year 5, nevertheless attached and persists beyond year 10.

The interpretive problem, as I see it, arises from the statute's unspoken premises. (B)(i)(II) seems to contemplate Scenarios A and B, and it seems to assume a single application for admission that is correctly decided. It draws a line between applications for admission filed within 10 years of departure, and those filed later. It does not explain what it means, however, to say that the alien who applies within the 10-year period is "inadmissible." Of course it means that a too-early application should be denied. But does it also mean that once the too-early application is denied, the alien is then forever inadmissible? And what is to be done with an alien whose application is *not* denied, but who is erroneously admitted despite being notionally inadmissible?

Neto stands in the shoes of Alien D. He was unlawfully present for one year or more when he overstayed his visa from 1994–2000. (Serv. MTD at 7; Pl. Opp. at 5.) He then departed from the United States in 2000—but did not *stay* "departed." Well within 10 years of that departure, in 2002, he sought admission. Thus, under the plain terms of the statute, Neto was "inadmissible"

---

[6] "Seeks admission" means both applying for admission at the border, as Neto did in 2000, and applying for adjustment of status from within the United States, as Neto did in 2016. *Matter of Rodarte-Roman*, 23 I.&N. Dec. 905, 908 (BIA 2006).

when he sought admission in 2002, because the 10-year waiting period had not elapsed. What creates the interpretive issue in this case is that Neto *was* nevertheless admitted in 2002, and has apparently been in the United States since then. The question is whether he is "inadmissible" now.

In 2016—16 years after his departure, and 14 years after his readmission—Neto applied for an adjustment of status, which requires that he be "admissible." He urges that a plain reading of (B)(i)(II) establishes that its bar is inapplicable: He departed in 2000, more than 10 years elapsed, and he applied for adjustment of status in 2016. The Service acknowledges, as it must, that his application in 2016 was not filed "within 10 years of the date of [his] departure," 2000. Nonetheless, the Service reasoned that, although actually admitted in 2002, he was nevertheless "inadmissible" in 2002 as a result of (B)(i)(II), and that his inadmissible status never changed thereafter. (*See* App. 6.)

One more point must be clarified. (B)(i)(II) has a limited function. It is not a complete statement of grounds for grant or denial of admission. Rather, it permits the Service to dispose of certain cases in a summary manner. It imposes a 10-year categorical bar to admission, irrespective of the application's other merits, or lack thereof. So during the 10-year waiting period, the application will be denied. After the expiration of the 10-year period, however, the alien may be, will not necessarily be, admitted. The categorical bar of (B)(i)(II) no longer applies, but any and all other grounds for exclusion may bar admission. That Alien D (or Neto) misrepresented her status in year 5, for example, may have adverse consequences, but that is a separate issue.

It is true that, in Scenarios C and D, the statutory bar may play out in an unexpected fashion. It is not uncommon, however, for a statutory category to be an imperfect proxy for the evil which Congress intended to reach. Based on (B)(i)(II)'s (1) words, (2) place in the statutory context, (3) purpose, and (4) interpretation by its implementing agency and the Third Circuit, I hold that an alien is inadmissible only during the 10-year period following his or her departure. Accordingly, the Service's position that Neto was inadmissible in

2016 because he sought (and obtained) admission in 2002 is an unwarranted extension of (B)(i)(II). That is not to say that he must be granted admission, but if he is inadmissible, it is not because he is subject to the categorical bar of (B)(i)(II).

### 2. Text

My starting point, of course, is the language of (B)(i)(II). *Khan v. Att'y Gen. U.S.*, 979 F.3d 193, 197 (3d Cir. 2020). Words derive meaning from surrounding words, and courts avoid giving words any broader meaning than their context can bear. *See Giovanni v. U.S. Dep't of Navy*, 906 F.3d 94, 106 (3d Cir. 2018). Here, the phrases "seeks admission" and "is inadmissible" are both expressed in the present tense. Because of this parallelism, the most natural reading of (B)(i)(II) is that an alien is inadmissible *when* the alien seeks admission within the 10-year period—*i.e.,* that an application for admission at that time must be denied. To understand inadmissibility under (B)(i)(II) as stretching beyond the 10-year period would strain the context of the words, which address a specific, temporally limited situation.[7]

Time and tense are not the same thing. The phrase "is inadmissible" does not refer to the literal present, *i.e.*, the moment that the reader is perusing the statute. Nor does it refer to the time that the drafter wrote it. It is the *statutory* "present," in the sense of the time at which the described event takes place and is permitted, prohibited, or otherwise affected by the statute.[8] The thought

---

[7]    The alternative interpretation requires us to read the statute to impose inadmissibility not temporarily, for a specified 10-year period, but permanently, for a certain class of people consisting of those who dared to apply for admission before that 10-year period had elapsed. The application before 10 years have elapsed would thus become, not just grounds for denial, but a brand of permanent disqualification. If that were the statute's drastic intent, we would expect a far clearer statement.

[8]    In that sense, it has been written (we might say "it is written") that a statute is "always speaking." *See* Goldfarb, Neal. (2013). "Always speaking"? Interpreting the present tense in statutes. Canadian Journal of Linguistics/Revue canadienne de linguistique. 58. 63-83. 10.1017/S0008413100002528. Linguistically, this quickly gets us into deep water. What I am describing, however, is not highly specialized, but a matter of familiar usage.

might be more clearly expressed as "is inadmissible during that 10-year period." But (B)(i)(II) is clear enough. Because it is patently concerned with declaring certain persons inadmissible during that 10-year period, but not thereafter, it makes sense to read "is inadmissible" to require denial of applications for admission within that 10-year period only.[9]

The meaning of (B)(i)(II) becomes clearer by comparison with related constructions in the statute. "[W]ord choice matters," and "Congress knows how to say such things when it wants to," *United States v. Hodge*, 948 F.3d 160, 163 (3d Cir. 2020), a comparative principle that applies *a fortiori* when applied within the same statute, *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 587–88 (3d Cir. 2020) (en banc). Here, Congress used language of permanency in other parts of § 1182(a), language that easily could have been transplanted to (B)(i)(II) to accomplish the same result, if that had been intended. For example, any alien who "has engaged in terrorist activity," § 1182(a)(3)(B)(i)(I), or "has engaged in the recruitment or use of child soldiers," § 1182(a)(3)(G), is inadmissible—by implication, forever. By using the past tense, Congress has indicated that any former terrorist activity or use of child soldiers renders an alien inadmissible thereafter. The present tense, used in (B)(i)(II), does not carry the same connotation. The past always remains the past; not so, the present.

Relatedly, Congress demonstrated that it knows how to bar aliens comprehensively by the simple expedient of employing *both* the past and present tense. Elsewhere, the statute provides that any alien who "is coming to the United States . . . to engage in prostitution, or has engaged in prostitution" is inadmissible. § 1182(2)(D)(i). The upshot of these provisions is that Congress knows how to impose inadmissibility on a perpetual basis, based on something the alien has done.

---

[9]      For those who would consult legislative history, the Conference Committee Report for the legislation that would become (B)(i)(II) states that "[a]n alien unlawfully present for 1 year or more who voluntarily departs is barred from admission for 10 years." H.R. Rep. No. 104-828, at 207 (1996) (Conf. Rep.). Thus, this Report tends to confirm that the admission bar operates only for ten years.

Congress did not do that in (B)(i)(II). Rather, Congress used the present tense ("seeks admission") when describing the act that renders an alien inadmissible, and it specified a time frame. Differing verb tenses within one statute are significant. *See Khan*, 979 F.3d at 198 ("Congress's use of different verb tenses in each of the clauses . . . reflects its intent for the two clauses to define separate requirements."). The use of only the present tense, in contrast to tenses used elsewhere, reinforces the notion that an alien is inadmissible under (B)(i)(II) at that time—*i.e.,* when seeking admission within the 10-year period. If Congress wanted to say that the past act of having sought admission within the 10-year period renders an alien inadmissible forever after, as the Service would have it, Congress could have said "seeks admission or has sought admission." Because Congress did not do that, and because reading inadmissibility in conjunction with the present tense of "seeks admission" is more natural, I reject the Service's reading of the statute's text.[10]

The text of the statute, then, most naturally reads as a categorical bar to admissibility which applies for 10 years after the alien departed, but not thereafter. As to comings, goings, or other events during that 10-year period, the statute is silent.

### 3. Context

I next consider the broader statutory context in which (B)(i)(II) appears, for "[s]tatutory context can suggest the natural reading of a provision that in isolation might yield contestable interpretations." *Monzon v. De La Roca*, 910 F.3d 92, 102 (3d Cir. 2018) (citation omitted). The section containing subparagraph (B)(i)(II) comprises a gradated scheme, in which (B)(i)(II) occupies an intermediate position, short of the lifetime ban for more serious violators of the immigration laws which is contained in the following subparagraph (C).

---

[10]     The only court to have faced a similar issue reads the statute as Neto does here. *See Kanai v. U.S. Dep't of Homeland Sec.*, No. 2:20-cv-05345-CBM-(KSx), 2020 WL 6162805, at *2 (C.D. Cal. Aug. 20, 2020). *Kanai* is discussed in section III.A.5, *infra.*

The subparagraph at issue, (B)(i)(II), is part of 8 U.S.C. § 1182(a). The numbered subsections of Section 1182(a) describe classes of aliens who are "inadmissible" and thus "ineligible to receive visas and ineligible to be admitted." One such class, described in subsection (a)(9), consists of "aliens previously removed" from the United States.

Subsection (a)(9) in turn is divided into subparagraphs. One of those is subparagraph (B), the one at issue here, titled "Aliens unlawfully present." Another, subparagraph (C), applies to "Aliens unlawfully present *after previous immigration violations*." (Emphasis added.) It stands to reason that the subparagraph (C) class might merits harsher treatment than the subparagraph (B) class, and a decision of the Board of Immigration Appeals ("BIA") lends support to that view. *Matter of Rodarte-Roman*, 23 I.&N. Dec. 905, 909 (BIA 2006). As described in *Rodarte-Roman,* subsection (a)(9)'s subparagraphs proceed stepwise in order of severity; they "seek to compound the adverse consequences of immigration violations by making it more difficult for individuals who have left the United States after committing such violations to be lawfully readmitted thereafter." *Id.*[11]

Accordingly, Subparagraph (B) "provides for the *temporary* inadmissibility of aliens who have been unlawfully present in the United States for certain continuous periods and who are seeking admission after having departed," while subparagraph (C) "provides for the *permanent* inadmissibility

---

[11]    The relevant portions of subparagraphs (B) and (C) are phrased similarly. The chief distinction lies in the applicability of the 10-year waiting period to persons illegally within the United States for more than one year. Subparagraph (B) provides that a person who seeks readmission within 10 years after departure or removal "is inadmissible." Subparagraph (C) provides that such a person "who enters or attempt to reenter the United States without being admitted is inadmissible," without specifying a waiting period. Because no time limit is specified, the implication would be that such a person is inadmissible *whenever* he or she enters or attempts to enter the United States. Later in subparagraph (C), there is a narrow exception for an alien seeking readmission more than 10 years after departure, if the Secretary has consented to the alien's reapplication for admission. 8 U.S.C. § 1182(a)(9)(C)(ii). The implication appears to be that the exception is available only to an alien applying for admission, after 10 years, with the Secretary's advance permission.

of any alien who enters or attempts to reenter the United States without being admitted after a prior removal." *Id.* (emphasis added).

   "[A]liens inadmissible under [subparagraph (C)] who attempt to enter or reenter without being admitted may be more culpable than those under [subparagraph (B)] who are seeking admission." *Cheruku v. Att'y Gen. U.S.*, 662 F.3d 198, 207 (3d Cir. 2011). Thus, it is subparagraph (C) which imposes the most severe consequence, permanent inadmissibility, on the most culpable violators. To read (B)(i)(II) as imposing the same punishment as subparagraph (C) would not be consistent with the expressed views of Congress that aliens qualifying for subparagraph (B) are a step below aliens qualifying for subparagraph (C) in culpability.

   In sum, I find that the Service's current interpretation is in considerable tension with that statutory scheme. Generally speaking, subparagraph (C) imposes permanent inadmissibility on past violators of the immigration laws; subparagraph (B) imposes the lesser sanction of inadmissibility for 10 years on less culpable persons. The Service's position—in effect, "once inadmissible, always inadmissible"— would render Neto permanently inadmissible under the nominally more lenient subparagraph (B). In the context of subsection (a)(9)'s gradated scheme, a lifetime ban for those who fall under subparagraph (B) would be anomalous.

### 4. Purpose

   I next consider whether my interpretation is consistent with the statute's purpose, or would produce absurd results. *Vooys v. Bentley*, 901 F.3d 172, 192 (3d Cir. 2018) (en banc). Most generally, "the provisions of § 1182(a)(9), including the ten-year bar, were intended to deter aliens who had accrued unlawful presence and then left the United States from later seeking admission." *Cheruku*, 662 F.3d at 207. "It is recidivism, and not mere unlawful presence, that section [(a)(9)] is designed to prevent." *Rodarte-Roman*, 23 I.&N. Dec. at 909.

Setting aside the particulars of Neto's case for a moment, the Service's position does not very clearly further the statute's purpose. Now there are clear cases; I refer to Scenarios A and B. (*See* Section III.A.1, pp. 7–8, *supra*.) These bespeak a statutory purpose to withhold admissibility on a categorical basis for 10 years after departure, but permit it thereafter. What (B)(i)(II) does *not* do, however, is impose a permanent ban on anybody.

The statute can be extended to Scenarios C and D only by distorting its text and attempting to implement some more general sense of its purpose. (*See* Section III.A.1, pp. 7–8, *supra*.) Such an approach, I believe, exceeds the bounds of prudent statutory construction. Consider Alien C, for example, who departed at the beginning of year 1, unsuccessfully sought admission in year 5, waited, and reapplied for admission in year 11. It does not advance the statute's purpose—understood as a 10-year bar or waiting period—to continue to bar Alien C from admission in year 11. Alien D differs from C in that her application for admission in year 5 was successful, before she went on to apply to adjust her status in year 11. Her status-adjustment application still conforms to the words of the statute, however, in that it occurs more than 10 years after she departed. What makes us uneasy is that she should not have been admitted in year 5—but that is a separate problem. We cannot fix that separate problem by grafting onto (B)(i)(II) a judicially-created doctrine that, where the application is wrongly granted, as opposed to denied, the alien's inadmissible status should be deemed permanent. On that view, (B)(i)(II) would operate as a punishment with permanent effects, rather than as a time-limited deterrent. That is inconsistent with both its wording and its evident purpose. *See Aguilar-Enriquez v. Holder*, 492 F. App'x 511, 517–18 (6th Cir. 2012) ("[(B)(i)(II)] only punishes an alien by barring that alien from applying for adjustment of status for 10 years."). Applying (B)(i)(II)'s bar only during the ten-year period is consistent with the statute's purpose in most if not all instances, and a few awkward in-between cases (perhaps remediable by other means) should not be used as a basis to distort its interpretation.

I will consider in addition whether my interpretation of the statute leads to an absurd result in this case, *i.e.*, one that casts doubt on that interpretation's correctness. Mr. Neto, an alien, sought admission during the 10-year period, in 2002 (two years after his departure). But instead of being deemed inadmissible, as the statute contemplates, he was admitted.[12] What should have happened was denial of admission.

Still, some level of illegal presence is a given; far from being an automatic or permanent disqualification, it is the very premise for application of (a)(9) itself, and (B)(i)(II) in particular. Mr. Neto waited for 16 years after his 2000 departure to apply for adjustment of his status to a lawful permanent resident. Although that period well exceeds the 10-year statutory waiting period, he spent most of that period inside, not outside, the country, as a result of the erroneous grant of his application to be admitted in 2002.

Now admittedly, this specific situation may not have been addressed by the statute's drafters. Applying the statute literally to this situation may even be bad policy. If so, the legislature, not the court, should fix it. "To depart from a statute's plain meaning today, the text must dictate a result so unreasonable that it amounts to an absurdity." *Riccio*, 954 F.3d at 588 n.2. That is a "high bar," as "[v]irtually all laws would be absurd if judged by whether they accomplish a perfect solution to an underlying legislative concern." *Id.* at 589 (citation omitted). The text, context, and purpose of (B)(i)(II) all indicate that its bar on admission applies only to the 10-year period. Applying (B)(i)(II)'s plain meaning to the facts here may reveal a statutory blind spot where an alien is accidentally admitted. Yet a gap in the statute is not the same thing as an absurdity. *See In re Visteon Corp.*, 612 F.3d 210, 234 (3d Cir. 2010) ("That [the statute] is a partial solution to congressional concerns in no way converts it into an absurdity."). Indeed, applying the Service's interpretation to avoid this

---

[12]    Because, according to the Service, he failed to reveal his prior unlawful presence and order of deportation, and the Service apparently failed to detect it on their own.

blind spot would thwart the statute's text and purpose. At bottom, (B)(i)(II) is a "*specific* bar[] to admissibility" under limited circumstances. *Cheruku*, 662 F.3d at 207 (emphasis added). That it does not capture the particular situation here does not evince any absurdity—only the reality that, like many statutes, its plain meaning is incapable of addressing every situation. *See Visteon*, 612 F.3d at 234.

To the extent Mr. Neto's case is anomalous, the anomaly is not so much a product of some absurdity in the statute as it is a product of a mistaken decision to admit him in 2002. Either because (1) Neto did not disclose his prior unlawful presence, or (2) the Government, at the time of his admission, did not catch his prior unlawful presence (or both), Neto was admitted. (B)(i)(II) does not contemplate this situation because it assumes that, when an alien "seeks admission" in the 10-year period, he will be properly denied admission. The result of interpreting the statute in Neto's favor produces a result that may be unanticipated, but is not absurd, and it does not bespeak a legislative failure to guard against an obviously absurd result. A court cannot rewrite a statute merely because the legislative means are not a perfect fit for the legislative ends.

### 5. Interpretation by other tribunals

I consider whether binding case law of the Court of Appeals dictates a result. It does not, but it does suggest that a literal approach to the statute's 10-year bar is the correct one.

To the limited extent it has interpreted (B)(i)(II), the Third Circuit has treated it straightforwardly, as creating a 10-year period of inadmissibility, running from the alien's departure. Construing (B)(i)(II) in relation to a question not presented here, the Third Circuit explained that the statute creates a "ten-year bar" and provides that "an alien with a one-year period of unlawful presence in the U.S. would not be eligible for consular admission and inspection at all *during the applicable bar period* without a waiver of inadmissibility." *Cheruku*, 662 F.3d at 207 (emphasis added). Therefore, the

Third Circuit, albeit in passing, indicated that (B)(i)(II) bars admission only "during the applicable bar period," ten years from a date of departure.

I also consider how the BIA's constructions of (B)(i)(II) illuminate the statute. *See County of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020) (in interpreting a statute that an agency administers, courts consider the agency's views and prior application, even when *Chevron* is inapplicable).[13]

In one case, *Rodarte-Roman,* the BIA, much like the Third Circuit, expressed a general sense that (B)(i)(II) does no more than impose a 10-year ineligibility period. There, the BIA addressed whether, under (B)(i)(II), the entire one year of unlawful presence must precede the departure. 23 I.&.N. Dec. at 908. The BIA held that it must: "an alien's departure from the United States triggers the 10-year inadmissibility period specified in [(B)(i)(II)] only if that departure was preceded by a period of unlawful presence of at least 1 year." *Id.* at 909. In construing (B)(i)(II), the BIA reasoned that (B)(i)(II) is intended to create a "temporary" period of inadmissibility and so operates in a literal way: first, an alien accrues one year of unlawful presence, then he departs, and then he seeks admission within 10 years. At the time he seeks admission, he is inadmissible. *Id.* The words of the statute are read literally, even if the tribunal thinks it would make just as much sense to apply the statute to aliens who left before accruing a year of unlawful presence: "Congress made departure . . . the event that triggers inadmissibility." *Id.*; *see also id.* at 910.

*Rodarte-Roman* thus evinces an understanding by the BIA that (B)(i)(II) creates a temporary bar of inadmissibility, running 10 years from the date of departure (preceded by one year of unlawful presence). The BIA's approach in *Rodarte-Roman* stresses a literal reading of (B)(i)(II): a straightforward timeline of unlawful presence, departure, and inadmissibility for 10 years.

---

[13]    The BIA's interpretations of the immigration statutes are entitled to deference when they come in a precedential decision. *Cheruku*, 662 F.3d at 202. The parties do not dispute that *Rodarte-Roman* is entitled to due consideration.

The only tribunal to have faced facts like Neto's, in the context of a very closely allied legal issue, read the statute much as Neto does here. In *Kanai v. U.S. Department of Homeland Security*, the plaintiff-alien entered the U.S. in 1996 on a visa, overstayed that visa, departed in 2003, entered the U.S. again in 2005 on a visa, overstayed that visa, and applied to adjust her status some 17 years after her departure, in 2020. No. 2:20-cv-05345-CBM-(KSx), 2020 WL 6162805, at *2 (C.D. Cal. Aug. 20, 2020); DE 24, at 1.The Service denied her application, reasoning that, although her period of inadmissibility began to run from 2003 (her departure), that period was tolled by her "substantively unlawful" admission in 2005 and subsequent unlawful presence in the country. DE 24, at 2. The court rejected the argument that (B)(i)(II) contemplates tolling of the 10-year period based on an intervening, unlawful readmission to the United States. 2020 WL 6162805, at *3. Rather, the court reasoned, the plain language of the statute entailed that the plaintiff was inadmissible for 10 years following 2003; because she applied for adjustment of status in 2020, well after that period expired, she was not subject to the (B)(i)(II) bar.

*Kanai* confirms my own plain-text reading of (B)(i)(II). The statute simply does not contemplate or address an alien's readmission following "departure" or provide that readmission affects the 10-year ineligibility period.[14]

---

[14]   Instead of arguing that Neto's 2002 admission *tolled* the period of inadmissibility, as in *Kanai,* the Service now reasons that the 2002 admission rendered Neto inadmissible from that day forth, regardless of when he applied for admission again. I therefore do not consider tolling *per se,* because that was not the basis of the agency's decision regarding Neto. *See Regents*, 140 S. Ct. at 1907. The issue is, however, closely parallel.

*Kanai* indicates, at a minimum, that the Service has not been completely consistent in its application of (B)(i)(II) to deny applications on similar facts. This inconsistency cuts against deferring to the Service's interpretation. *See Hayes v. Harvey*, 903 F.3d 32, 46 (3d Cir. 2018) (explaining that one of the "most important considerations" in deciding whether to defer to an agency's interpretation otherwise not afforded *Chevron* deference is whether the interpretation "is consistent and contemporaneous with other pronouncements of the agency" (citation omitted)).

The Service argues that a court in this District previously interpreted (B)(i)(II) in *Shah v. Thompson*, Civ. No. 11-3082, 2015 WL 113339 (D.N.J. Jan. 8, 2015), and that

* * *

In sum, the text, context, purpose, and prior interpretations of (B)(i)(II) persuade me that that the period of ineligibility runs from the date of departure, and that 10 years means 10 years. Accordingly, the Service's denial of Neto's application was "not in accordance with law," 5 U.S.C. § 706(2)(A), because the act of seeking admission in 2002 does not furnish sufficient reason to find Neto inadmissible under (B)(i)(II) in 2016.

## B. Remedy

I therefore address the question of remedy. The APA empowers courts to "set aside" unlawful agency action, § 706(2), so the ordinary course is to "vacat[e] invalid agency action and remand[] the matter to the agency for further review." *Comite De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014). The right course here is to vacate the Service's denial, declare it unlawful, and remand to the Service for "application of the correct legal test." *MCPC, Inc. v. NLRB*, 813 F.3d 475, 490 (3d Cir. 2016).

I decline to go any farther, as Neto might urge; generally, it is not a court's role to direct the agency how to act. Rather, a court's role is to review the agency's decision and, if it cannot be sustained, remand to the agency. *See Regents*, 140 S. Ct. at 1907–08*; see also INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) ("This [remand] principle has obvious importance in the immigration context."). Moreover, to the extent Neto seeks injunctive relief, that relief is effectively already provided by the vacatur and remand. If Neto is "dissatisfied with [the Service's] remedy [on remand], [he] would always have the option to seek review" of that decision in a new action under the APA. *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013). For that reason, courts decline to retain jurisdiction after vacating and remanding, and I will do so as well. *E.g.*, *Navajo Nation v. Azar*, 302 F. Supp. 3d 429, 441 (D.D.C. 2018).

---

*Shah*'s interpretation forecloses Neto's claim. (Serv. MTD at 11.) *Shah* is inapplicable, however, because there, the plaintiff did not wait out the ineligibility period, but filed an application for adjustment of status within 10 years of her departure. 2015 WL 113339, at *1, 4.

Remand is doubly appropriate because removal of the (B)(i)(II) categorical bar is not equivalent to a finding that the Service must approve Neto's application. It simply frees the Service to consider all other grounds to grant or deny the application. Put another way, there may be a reason to deny Neto's application, but (B)(i)(II) is not it.

## IV.    CONCLUSION

For the reasons set forth above, the Service's motion to dismiss is denied, and Neto's motion for summary judgment in the alternative is granted.

A separate order will issue.

Dated: December 10, 2020

/s/ Kevin McNulty
_____
**Hon. Kevin McNulty**
**United States District Judge**